DA 09-0083

IN THE SUPREME COURT OF THE STATE OF MONTANA

2009 MT 447N

DAVID SIEGLE, and SIEGLE, INC.,

   Plaintiffs, Appellees, and Cross-Appellants,

 v.

SANFORD K. HELMUTH, a/k/a SANDY HELMUTH,

   Defendant and Appellant.

APPEAL FROM:  District Court of the Seventh Judicial District,
        In and For the County of Dawson, Cause No. DV 06-021
        Honorable Katherine M. Irigoin, Presiding Judge

COUNSEL OF RECORD:

   For Appellant:

     Albert R. Batterman, Batterman Law Offices, Baker, Montana

   For Appellees:

     Richard O. Harkins, Attorney at Law, Ekalaka, Montana

         Submitted on Briefs: November 12, 2009

             Decided: December 29, 2009

Filed:

    _____
         Clerk

Justice John Warner delivered the Opinion of the Court.

¶1     Pursuant to Section I, Paragraph 3(c), Montana Supreme Court 1996 Internal Operating Rules, as amended in 2006, the following decision shall not be cited as precedent. It shall be filed as a public document with the Clerk of the Supreme Court and shall be reported by case title, Supreme Court cause number and result to the State Reporter Publishing Company and to West Group in the quarterly table of noncitable cases issued by this Court.

¶2     In February 2008, this case was tried to the District Court, Seventh Judicial District, Dawson County. The District Court entered findings of fact, conclusions of law and an order, voiding all of the shares of the Montana corporation, Siegle, Inc., that had been issued to the defendant Sandford Helmuth (Helmuth). The District Court also ordered that a portion of such shares be transferred back to the Estate of Wilhelm Siegle, determined that Helmuth and plaintiff David Siegle had monetary obligations to Siegle, Inc., and denied David Siegle's prayer for attorney fees. Helmuth appeals and David Siegle cross-appeals. Siegle, Inc. has not participated in this appeal. We reverse and remand with instructions.

¶3     We restate the issues on appeal as follows:

¶4     Issue 1: Did the District Court err in concluding that an agreement in which 282 shares of Siegle, Inc. stock was purportedly transferred to Helmuth is actually a pledge agreement to secure a prior loan, and thus Helmuth did not own such stock?

2

¶5    Issue 2: Did the District Court err when it concluded that 225 shares of Siegle, Inc. stock were issued to Helmuth wrongfully, and therefore order that the issue of such stock is void?

¶6    Issue 3: Did the District Court err when it found Helmuth committed actual fraud in his dealings with David Siegle and thus concluded punitive damages are appropriate?

¶7    Issue 4: Did the District Court err when it did not determine the value of the shares of stock in Siegle, Inc. and instead held that Helmuth was not a shareholder and fixed the amount of certain debts of the corporation, Helmuth, and David Siegle?

¶8    David Siegle cross-appeals, raising the following issues:

¶9    Issue 5: Did the District Court err when it ordered David Siegle to pay Siegle, Inc. $117,276?

¶10   Issue 6: Did the District Court err when it denied David Siegle's prayer for attorney fees?

¶11   In 1971, Wilhelm Siegle formed Siegle, Inc., a corporation that operated a dairy farm in Dawson County, Montana. In 1977, his son, David Siegle, was named president of the corporation. Wilhelm Siegle wished to have David Siegle manage the dairy. So, at the direction of Wilhelm Siegle, the corporation agreed to buy 232 shares of its own stock from Wilhelm and then make monthly payments to him in the amount of $600. However, Siegle, Inc. defaulted on its obligation to make the payments in February 1999. A receiver was appointed for Siegle, Inc. and discovered that in the mid-1990s, David Siegle had wrongfully taken a large amount of money from the corporation for his personal use.

3

¶12 In November 1999, the shareholders elected David Siegle's brother, Phillip Siegle, president of the corporation. David Siegle continued as an employee of Siegle, Inc., conducting its day-to-day dairy business. He held the office of vice president, was not in control of the corporation's receipts or disbursements, and did not have authority to incur debt on behalf of Siegle, Inc. or dispose of corporate property.

¶13 In December 1999, Siegle, Inc. was unable to make a required payment of $13,013 to the Federal Land Bank. Wilhelm Siegle sought the help of a neighbor, Helmuth, in making the payment. Helmuth wrote a check to Siegle, Inc. for the Land Bank payment and, in return, Siegle, Inc. gave him a promissory note for the same amount that Helmuth signed as president of Siegle, Inc. However, Helmuth had not properly been made president of the corporation when he executed this promissory note.

¶14 On February 1, 2000, Helmuth, David Siegle, Wilhelm Siegle and Phillip Siegle signed a written agreement (Agreement). Wilhelm and Phillip Siegle signed as "seller," Helmuth signed as "buyer," and David Siegle signed individually. The Agreement provides, *inter alia*: (1) Helmuth will loan the corporation $44,110 and the corporation agrees to execute two promissory notes in favor of Helmuth, one for the land payment amount and one to repay Phillip Siegle $30,098; (2) Wilhelm Siegle agrees to transfer his 282 shares of stock to Helmuth; (3) Siegle, Inc. agrees to pay Phillip Siegle $30,098; (4) additional creditors may exist of which Wilhelm Siegle is not aware; (5) David Siegle would have the option to buy 49% of the outstanding stock of Siegle, Inc. from Helmuth, unless he wanted to buy 100% of the shares "for one dollar and other valuable consideration"; and, (6) Siegle, Inc. and

4

Helmuth will hold Wilhelm and Phillip Siegle harmless for any debts of the corporation. The Agreement also states it is "doubtful that these shares have any value, because the debts of the Corporation may exceed its assets." It appears from the record that Helmuth made the payments specified in the Agreement and 282 shares of Siegle, Inc. were ultimately transferred to him.

¶15    Three months later, in April 2000, Helmuth prepared a balance sheet reflecting the net worth of Siegle, Inc. as $126,488.[1] In June, David Siegle (hereafter Siegle) sought to exercise his option to buy all of Helmuth's shares in Siegle, Inc.

¶16    In July 2000, Siegle filed for bankruptcy; at least a portion of his debts were discharged. No documents from bankruptcy court are included in the record, thus nothing in the record shows which of Siegle's debts were listed on the schedules he filed in the bankruptcy court, whether anyone objected to the discharge of any debts, or which debts were discharged.

¶17    In October 2000, Helmuth prepared another balance sheet, listing the net worth of Siegle, Inc. as $488,309, an increase in value of $362,020 between April and October 2000.[2] Helmuth advised Siegle's attorney he would accept $466,239.62 for his shares in Siegle, Inc. Siegle was not able to exercise his option to buy Helmuth's stock.

---

[1]  This balance sheet also says that the value of Siegle, Inc. in 1997 had been $617,156.
[2]  Still, between April and October Helmuth successfully negotiated with some of the corporation's creditors to reduce Siegle, Inc.'s unsecured debt by $101,000.

¶18    In November 2000 at a shareholder meeting of Siegle, Inc., the shareholders elected Helmuth as president and also discussed setting a value for the shares should Siegle again decide to exercise his option. Siegle and his attorney were present at this meeting.

¶19    In February 2001, Helmuth prepared a balance sheet showing the net worth of Siegle, Inc. as $455,655. In April 2001, Helmuth prepared yet another balance sheet for Siegle, Inc. showing the corporation had a net worth of only $249,004.

¶20    In May 2001, Helmuth called a meeting of Siegle, Inc.'s directors. Helmuth, his attorney, the secretary of the corporation, Siegle and his attorney attended the meeting. At this meeting, Helmuth proposed to issue an additional 225 shares of Siegle, Inc. to himself in payment for the debts owed to him by the corporation. Based on the April balance sheet, he announced that the shares were worth $594.27 each. Siegle's attorney objected to issuing the stock at this price and asked for financial documents to support Helmuth's figures. Siegle's attorney said he would "confirm" his objection five days after he received the documents. Siegle later received the documents, but did not make any further objection.

¶21    About a month later on June 19, 2001, after hearing nothing from Siegle or his counsel, Helmuth caused Siegle, Inc. to issue to himself 225 shares of additional stock. He testified at trial that these shares were issued to him in exchange for $78,111 in promissory notes that had not been paid (the same promissory notes mentioned in the February 2000 Agreement), as well as $55,601 of work, tractor rental, and president's salary.[3] After this

---

[3] No tax returns reflected any income paid to Helmuth by Siegle, Inc. nor did Siegle, Inc. reflect a deduction for salary paid to Helmuth.

6

new stock was issued, Helmuth owned 507 shares of Siegle, Inc. and Siegle owned 137 shares.

¶22 In August 2001, David Siegle was terminated as an employee of Siegle, Inc. He was living in a house owned by the corporation, and did not want to leave. Eventually, the corporation evicted him.

¶23 Siegle filed this action in March 2004. He prayed for a court to order that he be allowed to inspect the corporate records under § 35-1-1107, MCA, to dissolve the corporation under § 35-1-938(2)(b), MCA, for a remedy under § 35-1-939, MCA, should dissolution not be warranted, and for an injunction to preserve corporate assets during the litigation. Siegle alleged he was an oppressed minority shareholder because Helmuth manipulated Siegle, Inc. so that it did not pay dividends to him and deprived him of any voice in management. Siegle alleged that Helmuth breached his fiduciary duty to him and he also prayed for emotional distress damages.

¶24 After significant delays for discovery, changes in attorney and other factors, the presiding district judge signed a final pretrial order on February 11, 2008, and trial commenced before the District Court on February 20, 2008.

¶25 The District Court concluded that the portion of the Agreement in which Wilhelm transferred his 282 shares of the stock of Siegle, Inc. to Helmuth was not supported by consideration and was unenforceable. It ordered that these 282 shares be transferred back to

the Estate of Wilhelm Siegle.[4] Then, because the Agreement transferring Wilhelm's shares was not enforceable, the District Court concluded Helmuth did not have sufficient control of the corporation to issue himself an additional 225 shares on May 16, 2001. The result of these rulings was that the Estate of Wilhelm Siegle owned 282 shares of Siegle, Inc., Siegle owned 137 shares, and Helmuth owned no shares of the corporation.

¶26 Citing § 30-9A-102(1)(ttt)(iv), MCA, the District Court determined that the Agreement was, in reality, a pledge rather than a sale of the stock and therefore Helmuth had the right to be paid what Siegle, Inc. owed him, but he was not a shareholder.

¶27 The District Court also concluded that Helmuth committed actual fraud by manipulating and falsifying the balance sheets to inflate the price of shares when Siegle expressed interest in exercising his option to buy Helmuth's shares, and deflating the price when Helmuth wanted to buy shares to repay loans to the corporation. Thus, the District Court awarded Siegle $746 as punitive damages.

¶28 As for Siegle's allegation of oppression and request to dissolve the corporation, the District Court considered § 35-1-938(2)(b), MCA—that provides a court may dissolve a corporation if the directors or those in control of the corporation have acted in a manner that is illegal, oppressive or fraudulent—and found that Helmuth's firing and eviction of Siegle "showed oppression," Helmuth defrauded Siegle by providing him with invalid balance sheets, Helmuth deprived Siegle of his right to participate in management, and Helmuth did

---

[4] Wilhelm Siegle passed away seven days after trial. The District Court considered any interest of Wilhelm in Siegle, Inc. owned by his estate.

not provide Siegle access to the corporation's books. The District Court thus concluded Helmuth breached his fiduciary duties owed to Siegle, the minority shareholder, apparently based on the findings stated above.

¶29 As a remedy, the District Court ordered that Siegle, Inc. pay Helmuth what it owed him, including the amounts of the promissory notes, other loans and wages. The District Court ordered that Helmuth was to collect a debt owed to Siegle, Inc. by a Hutterite Colony, incurred in a transfer of a right to produce milk (milk quota). The court also ordered that Siegle repay the corporation what it calculated as the amount he had misappropriated.

¶30 The District Court also awarded Siegle his attorney fees, contingent on review and approval of the amount of such fees. However, after a hearing, the District Court vacated this order, holding attorney fees are not allowed because there is no contractual or statutory basis for an award of attorney fees.

¶31 *Issue 1: Did the District Court err in concluding that an agreement in which 282 shares of Siegle, Inc. stock was transferred to Helmuth is a pledge agreement to secure a prior loan and thus Helmuth did not own such stock?*

¶32 The District Court ordered that because there was no consideration for the February 1, 2000, Agreement, the ownership of the 282 shares of stock did not transfer from Wilhelm Siegle to Helmuth. However, in his amended complaint, Siegle alleges that Helmuth is the majority shareholder and chief operating officer of Siegle, Inc. The final pretrial order, which supersedes the pleadings and was signed by the District Court and counsel for both Siegle and Helmuth, states it is an agreed fact that "Sandford Helmuth became majority

9

stockholder of Siegle, Inc. on February 1, 2000, by transfer of 282 shares of stock from Wilhelm Siegle."

¶33 A pretrial order supersedes the pleadings. *Faulconbridge v. State*, 2006 MT 198, ¶ 69, 333 Mont. 186, 142 P.3d 777. The pretrial order "controls the subsequent course of the action." M. R. Civ. P. 16(e). The purpose of pretrial orders is to prevent surprise, simplify the issues, and permit counsel to prepare their case for trial on the basis of the pretrial order. *Weimar v. Lyons*, 2007 MT 182, ¶ 20, 338 Mont. 242, 164 P.3d 922. A legal theory or factual issue must be at least implicitly included in the pretrial order, albeit the pretrial order should be liberally construed to permit any issues that are embraced within their language. *Weimar*, ¶ 20.

¶34 The record does not show that the District Court concluded the pretrial order must be modified in order to prevent manifest injustice. Nor is lack of consideration an issue expressed or implied by the pretrial order. To the contrary, the record clearly shows that both Siegle and Helmuth came to trial believing Helmuth was the majority shareholder of Siegle, Inc. and were thus prepared to have the District Court fix the worth of a share of the corporation. Helmuth desired that the share price be fixed so that he could buy Siegle's 137 shares. On the first day of trial, to Helmuth's surprise, it became apparent that Siegle wanted the District Court to order he was entitled to exercise his option under the Agreement and buy Helmuth's 507 shares. Nevertheless, Siegle at no time gave any indication in his pleadings that he sought to have the District Court void any of the shares of stock held by Helmuth.

10

¶35    The pleadings and the District Court's pretrial order provide that it is an established fact in this case that Helmuth is the majority shareholder in Siegle, Inc. and that he holds, at the least, 282 shares of stock in the corporation. It was a complete surprise to Helmuth that the District Court ordered that these shares were not properly transferred to him. He had no opportunity to defend his ownership of such stock. And, while Siegle argues on appeal that the District Court should be affirmed, there is no indication in the record that he was not also completely surprised at the District Court's order. It was error for the District Court to invalidate the transfer of Wilhelm Siegle's 282 shares to Helmuth and declare that the Agreement was a pledge of the stock to secure a loan.

¶36    *Issue 2: Did the District Court err when it concluded that 225 shares of Siegle, Inc. stock were issued to Helmuth wrongfully, and therefore order that the issue of such stock is void?*

¶37    The District Court held, in essence, that because Helmuth was not a shareholder of the corporation and did not properly have control of Siegle, Inc. when he caused the corporation to issue 225 shares to himself, these shares were illegally issued and void.

¶38    The record does not contain either the articles of incorporation or the bylaws of the corporation. So, there is no record before the District Court or this Court that in order to be a director of Siegle, Inc. a person is required to be a shareholder. Nor is there anything in the record indicating that the board of directors of Siegle, Inc. may not issue stock in the corporation.

11

¶39 It is agreed, and the record shows, that on June 19, 2001, when these 225 shares were issued, Siegle, Inc. still owed Helmuth $78,111 as provided in promissory notes. The corporation also owed him substantial sums for his efforts on its behalf as president's salary and equipment rental.

¶40 Siegle did not claim in his amended complaint that these shares were improperly issued. The pretrial order does not state that Siegle seeks to have this stock declared void. The record shows that the various debts owed by Siegle, Inc. to Helmuth were cancelled in exchange for this stock. There is nothing in the record that would show that this stock was wrongfully issued. The District Court erred in ordering that 225 shares of stock be cancelled. The record establishes that Helmuth is the owner of 507 shares and Siegle is the owner of 137 shares of Siegle, Inc.

¶41 *Issue 3: Did the District Court err when it found Helmuth committed actual fraud in his dealings with Siegle and thus concluded that punitive damages are appropriate?*

¶42 The District Court found, as a matter of fact, that Helmuth defrauded Siegle by manipulating the balance sheets and, thus, awarded Siegle $746 as punitive damages. On appeal, Helmuth claims this is error because Siegle did not plead fraud with particularity, as is required by M. R. Civ. P. 9(b) and *Pipinich v. Battershell*, 232 Mont. 507, 759 P.2d 148 (1988). Allegations of fraud must be pled with particularity and supported by facts and not simply based "upon information and belief." *C. Haydon Ltd. v. Montana Min. Properties, Inc.*, 262 Mont. 321, 325-26, 864 P.2d 1253, 1256 (citing M. R. Civ. P. 9(b)).

¶43 Punitive damages may be awarded when the defendant has been found guilty of malice or actual fraud. Section 27-1-221(1), MCA. Siegle did not allege in his amended complaint that Helmuth defrauded him or that he acted maliciously. Punitive damages crept into this case for the first time in the pretrial order that states it is an issue of fact whether Siegle is entitled to an award of punitive damages. The pretrial order then lists as an issue of law whether Helmuth is guilty of malice. The word "malice" does not appear in the District Court's findings of fact, conclusions of law and order.

¶44 A claim for punitive damages based on fraud was not properly plead. The pretrial order, which obliquely refers to punitive damages, can only be interpreted to mean that Siegle would attempt to prove that Helmuth acted with malice and the District Court did not find that malice was proven. The District Court's conclusion that Helmuth is guilty of fraud to justify punitive damages, even in the minimal amount of $746, must be reversed. Upon remand, punitive damages are not to be a part of this case.

¶45 *Issue 4: Did the District Court err when it did not determine the value of the shares of stock in Siegle, Inc. and instead held that Helmuth was not a shareholder and fixed the amount of certain debts of the corporation, Helmuth and David Siegle?*

¶46 Siegle's amended complaint prays for an order under § 35-1-938(2)(b), MCA, dissolving Siegle, Inc. and, if the corporation is not dissolved, for relief as provided in § 35-1-939, MCA. In the final pretrial order, the parties agreed Helmuth owned 282 shares of Siegle, Inc., he loaned the corporation $78,111, and Siegle, Inc. had sold a milk quota of 7088 pounds for $127,584 that has not been paid. These facts are established. The final

13

pretrial order states that among the issues of fact to be decided are whether Siegle should be entitled to exercise the option to purchase Helmuth's stock in Siegle, Inc. as provided in the Agreement and whether Siegle, Inc. should be dissolved.

¶47 The record shows that when the trial started, Helmuth desired to have a price per share of Siegle, Inc. determined and that he be allowed to buy Siegle out. Likewise, Siegle desired to have a price per share determined and that he be allowed to buy Helmuth out. Siegle pled for relief under § 35-1-939, MCA, which provides that a court may order that any shareholder may purchase shares of any other shareholder at a fair value of the shares.

¶48 The order of the District Court was not contemplated in the pleadings, in discovery, or in the pretrial order. The District Court's order ignores agreed facts and comes as a complete surprise to the parties. Helmuth had no opportunity to defend against the remedy provided by the District Court and is prejudiced thereby.

¶49 The District Court order of June 16, 2008, must be reversed. This case must be remanded to the District Court for a determination of the fair value of the shares of Siegle, Inc., considering the facts as agreed upon by the parties. Upon remand, a share value must be established considering the evidence now in the record and such further evidence that is necessary.

¶50 After a determination of the value of the shares of the corporation, the District Court must decide whether Siegle, Inc. shall be dissolved as provided in § 35-1-938, MCA, or whether other relief provided for in § 35-1-939, MCA, is appropriate.

14

¶51    *Issue 5:  Did the District Court err when it ordered Siegle to pay Siegle, Inc. $117,276?*

¶52    Siegle, in his cross-appeal, claims that the District Court erred in ordering him to pay Siegle, Inc. $117,276, as this debt has been discharged in bankruptcy.

¶53    In his counterclaim, Helmuth alleged that, in a Chapter 13 bankruptcy proceeding, Siegle discharged a debt to Siegle, Inc. in the amount of $92,686.  In his answer to the counterclaim, Siegle admits that his debt of $92,686 to Siegle, Inc. was discharged.

¶54    The District Court, after noting that Siegle had discharged a debt to Siegle, Inc. in the amount of $92,686, found that Siegle had also used corporate funds to make an $8,900 down payment for a friend and had paid expenses of $15,000 for another friend.  The District Court stated that these amounts were shown on Exhibit U.  However, the District Court file contains a note that Exhibit U was objected to, is "out" and there is no Exhibit U in the record before this Court.  The District Court also found that Siegle paid $690 of corporate funds to insure a friend's vehicle.  The District Court then ordered Siegle to pay Siegle, Inc. $117,276, which includes the $92,686 that the parties admit was discharged in bankruptcy, as well as the additional $24,590.

¶55    A debt that is discharged in bankruptcy may not be collected.  11 U.S.C. § 524(a)(1). Thus, under the admitted facts of this case, the District Court erred in ordering Siegle to pay at least $92,686 to Siegle, Inc.  The record is insufficient to determine whether the remaining $24,590 is owed to Siegle, Inc., and if so whether this debt has been discharged in

bankruptcy. The $24,590 may have been included in the debts listed in Siegle's bankruptcy petition and may or may not have been discharged under a provision of 11 U.S.C. § 1328.

¶56 The District Court erred in ordering Siegle to pay $117,276 to Siegle, Inc. Upon remand this amount shall be reduced by at least $92,686. Whether $24,590 of this amount is owed by David Siegle to Siegle, Inc. shall be reconsidered upon remand.

¶57 *Issue 6: Did the District Court err when it denied Siegle's prayer for attorney fees?*

¶58 In its initial order, the District Court awarded Siegle his attorney fees pending review and approval by the court. After a hearing, the District Court reversed this order and declined to award attorney fees.

¶59 On appeal, Siegle, citing only inapposite cases, presents an incoherent argument that he is entitled to attorney fees. Montana follows the general American Rule that a party in a civil action is not entitled to attorney fees absent a specific contractual or statutory provision. *United Nat. Ins. Co. v. St. Paul Fire & Marine Ins. Co.*, 2009 MT 269, ¶ 37, 352 Mont. 105, 214 P.3d 1260. Siegle does not cite to any contractual provision or any applicable statutory or case authority showing he is entitled to an award of fees in this proceeding. The District Court did not err in denying Siegle his attorney fees.

¶60 The District Court's order of June 16, 2008, is reversed and this case is remanded to the District Court for further proceedings in conformity with this opinion. The District Court's order of January 2, 2009, denying Siegle's motion for attorney fees, is affirmed. Neither party shall have their costs on appeal.

16

/S/ JOHN WARNER

We Concur:

/S/ MIKE McGRATH
/S/ JAMES C. NELSON
/S/ PATRICIA O. COTTER
/S/ JIM RICE
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS